UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

MARGUERITE DiMAURO, O/B/O ) No. CV-06-0271-AAM
L.D., a minor child, )
) **ORDER GRANTING**
) **DEFENDANT'S MOTION**
) **FOR SUMMARY JUDGMENT,**
Plaintiff, ) *INTER ALIA*
)
vs. )
)
MICHAEL J. ASTRUE, )
Commissioner of Social )
Security, )
)
)
)
Defendant. )
_____ )

**BEFORE THE COURT** are plaintiff's motion for summary judgment (Ct. Rec. 23) and the defendant's motion for summary judgment (Ct. Rec. 28).

**JURISDICTION**

On August 15, 2003, plaintiff's mother, Marguerite DiMauro, protectively applied for Title XVI Supplemental Security Income benefits ("SSI") on behalf of her minor child, L.D., referred to herein as "plaintiff." The application was denied initially and on reconsideration. After timely requesting a hearing, plaintiff, represented by counsel, appeared and testified before Administrative Law Judge ("ALJ") Mary Bennett Reed on December 13, 2005. Plaintiff's mother also testified at the hearing, as did medical advisor/expert, W. Scott Mabee, Ph.D.. On

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-** 1

February 13, 2006, the ALJ issued a decision denying benefits. The Appeals Council denied a request for review and the ALJ's decision became the final decision of the Commissioner. This decision is appealable to district court pursuant to 42 U.S.C. § 405(g).

## STATEMENT OF FACTS

The facts have been presented in the administrative transcript, the ALJ's decision, the plaintiff's and defendant's briefs and will only be summarized here. At the time of the hearing, plaintiff was 11 years old and attending grade school. Plaintiff alleges disability due to attention deficit hyperactivity disorder (ADHD), dyslexia, delayed talking, ear problems, allergies, and scotopic sensitivity syndrome.

## STANDARD OF REVIEW

"The [Commissioner's] determination that a claimant is not disabled will be upheld if the findings of fact are supported by substantial evidence, 42 U.S.C. § 405(g)...." *Delgado v. Heckler*, 722 F.2d 570, 572 (9th Cir. 1983). Substantial evidence is more than a mere scintilla, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975), but less than a preponderance. *McAllister v. Sullivan*, 888 F.2d 599, 601-602 (9th Cir. 1989); *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573, 576 (9th Cir. 1988). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "[S]uch inferences and conclusions as the [Commissioner] may reasonably draw from the evidence" will also be upheld. *Beane v. Richardson*, 457 F.2d 758, 759 (9th Cir. 1972); *Mark v. Celebrezze*, 348 F.2d 289, 293 (9th Cir. 1965). On review, the court considers the record as a whole, not just the evidence supporting the decision of the Commissioner. *Weetman v. Sullivan*, 877 F.2d 20, 22 (9th Cir. 1989), quoting

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-** 2

*Kornock v. Harris*, 648 F.2d 525, 526 (9th Cir. 1980); *Thompson v. Schweiker*, 665 F.2d 936, 939 (9th Cir. 1982).

It is the role of the trier of fact, not this court to resolve conflicts in evidence. *Richardson*, 402 U.S. at 400. If evidence supports more than one rational interpretation, the court must uphold the decision of the ALJ. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).

A decision supported by substantial evidence will still be set aside if the proper legal standards were not applied in weighing the evidence and making the decision. *Brawner v. Secretary of Health and Human Services*, 839 F.2d 432, 433 (9th Cir. 1987).

## ISSUES

Plaintiff argues the ALJ erred in determining that plaintiff's impairments do not medically or functionally equal an impairment set forth in the Listing of Impairments.

## DISCUSSION
### SEQUENTIAL EVALUATION PROCESS

An individual under the age of 18 is considered disabled if he "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).

The Commissioner has established a three-step sequential evaluation process for determining whether a child is disabled. 20 C.F.R. §416.924. Step one determines if the child is engaged in substantial gainful activities. If he is, benefits are denied. 20 C.F.R. §416.924(b). If he is not, the decision-maker proceeds to step two, which determines whether the child has a medically severe impairment or

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-** 3

combination of impairments.  20 C.F.R. §416.924(c).  If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step, which requires the child's impairment to meet, medically equal, or functionally equal an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1.[1]  20 C.F.R. §416.924(d).  If the impairment meets or equals one of the listed impairments, the child is conclusively presumed to be disabled.

**ALJ'S FINDINGS**

The ALJ found plaintiff had not engaged in substantial gainful activity and had severe medically determinable impairments, those being ADHD, cognitive disorder NOS (not otherwise specified), and sleepwalking.  The ALJ found, however, that these impairments do not meet or medically equal any of the listed impairments.  Furthermore, the ALJ found plaintiff does not have an "extreme" limitation in any domain of functioning, does not have a "marked" limitation in two domains of functioning, and therefore, does not have impairments which functionally equal a listed impairment.  Accordingly, the ALJ concluded the plaintiff is not disabled.

**MEDICAL EQUIVALENCE**

An impairment is medically equivalent to a listed impairment if it is at least equal in severity and duration to the criteria of any listed impairment.  20 C.F.R. §416.926(a).

In her decision, the ALJ noted that "[s]pecific attention was directed to sections 112.02 and 112.12 of the listing of impairments dealing with cognitive

---

[1] Part B provides the medical criteria for the evaluation of impairments of children under the age of 18.

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-** 4

disorders and attention deficit hyperactive disorder." (Tr. at p. 30).[2] The ALJ found that plaintiff had not shown "the findings on examination required for disability to be predicated upon medical considerations alone." (*Id*.). In support thereof, the ALJ cited the testimony of Dr. Mabee that plaintiff's mental disorders did not meet or equal the requirements of the listings, "causing only a less than marked impairment in the areas of cognitive/communicative, personal, social, and concentration, persistence or pace." (*Id*.)

Plaintiff contends the ALJ erred in failing to explain why plaintiff's impairments do not medically equal a listing and indeed, failed to mention the listing which the claimant most nearly meets, that being 112.05 "Mental Retardation." The ALJ did explain why she found that plaintiff's impairments did not medically equal a listing (i.e., the testimony of Dr. Mabee). Accordingly, this is not akin to the situation in *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990), where the ALJ did not offer any explanation at all, but simply concluded that "[t]he claimant ha[d] failed to provide evidence of medically determinable impairments that meet *or equal the Listings* to Subpart P of Regulation 4 or the duration requirements of the Act . . ." (Emphasis in original). The Ninth Circuit found this finding insufficient to show that the ALJ in *Marcia* actually considered equivalence. The ALJ in the captioned matter did consider equivalence.[3]

---

[2] The listing for ADHD is actually 112.11, not 112.12.

[3] Whether the ALJ's finding that there was not medical equivalence is supported by substantial evidence is another question. Plaintiff offers no specific argument as to why substantial evidence does not support the ALJ's determination of a lack of medical equivalence with regard to Listings 112.02 and 112.11 (i.e., no discussion of the specific medical criteria of those listings). These Listings contain both a medical component (Criteria "A") and a functional component (Criteria "B"). The functional component- marked impairment in age-appropriate cognitive/communicative function; marked impairment in age-appropriate social

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-** 5

The ALJ was never presented with an argument that Listing 112.05 was equaled and so plaintiff's argument seems to be that the ALJ should have considered it on her own initiative. This listing is met when there is "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function." In April 2001, the Wechsler Intelligence Scale For Children (WISC-III) was administered to the plaintiff with the following results: Verbal IQ- 102; Performance IQ- 108; Full Scale IQ- 106. These scores were considered to be in the "average" range. (Tr. at pp. 355-56). On February 27, 2003, the plaintiff was struck by a car as he was walking down a road. The mirror of the car struck the plaintiff in the left temporal region of his head. (Tr. at p. 509). In August 2004, plaintiff was seen by Jody Veltkamp, Psy. D., for a neuropsychological evaluation. Dr. Veltkamp administered the WISC-III to the plaintiff. This time, the results were as follows: Verbal IQ- 71; Performance IQ- 102; Full Scale IQ- 84. (Tr. at p. 531). According to Dr. Veltkamp:

> Overall, [L.D.'s] neuropsychological evaluation, along with his history, indicates the presence of mild to moderate impairments in higher cortical functioning of the brain. His deficits localize primarily to the left hemisphere, consistent with his abnormal EEG. As this EEG preceded the bump that he received in the left temporal lobe region from a passing motor vehicle, it would appear that these deficits are congenital in nature and did not result primarily from this mild head injury.

(Tr. at p. 536).

Dr. Veltkamp's diagnoses included "Cognitive Disorder, NOS [Not Otherwise Specified], Left Hemisphere Dysfunction." (Tr. at p. 536).

/ / /

---

functioning; marked impairment in personal functioning; marked difficulties in maintaining concentration, persistence and pace- overlaps with the functional equivalence "domain" inquiry discussed *infra*.

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-** 6

Dr. Veltkamp did not diagnose or even suggest a diagnosis of mental retardation which is not an organic mental disorder (a dysfunction of the brain).

John J. Wey, M.D., a psychiatrist with Central Washington Comprehensive Mental Health, saw the plaintiff for a psychiatric evaluation on February 21, 2003, just days before plaintiff was struck by the motor vehicle. His diagnoses at that time did not include any suggestion of mental retardation. (Tr. at p. 466). When Dr. Wey saw the plaintiff subsequent to the neuropsychological evaluation by Dr. Veltkamp, Dr. Wey began to diagnose "Cognitive Disorder, NOS" on Axis I, as well as "Left hemisphere dysfunction status post motor vehicle accident" on Axis III.[4] (Tr. at pp. 553, 558, 569, 577, 591, 622, ). He never, however, diagnosed the plaintiff with mental retardation on Axis II or even remotely suggested such a diagnosis. Indeed, in a "Progress Note" from November of 2004, Dr. Wey stated: "Since [plaintiff] is not mentally retarded, he does not have Fragile X [syndrome]." (Tr. at p. 614).[5]

There was nothing in the record that should have prompted the ALJ to engage in a medical equivalency analysis under Listing 112.05 and therefore, the

---

[4] Mental disorders diagnosed on Axis I are those that cause the patient significant impairment and are the focus of the patient's treatment. The exception is personality disorders and mental retardation, which are diagnosed on Axis II. Diagnoses on Axis III are general medical conditions that are potentially important in understanding or managing the patient's mental disorder. Axis IV consists of stressors in the person's environment or social setting that may affect diagnosis, treatment, and outlook of the patient's mental disorder. Axis V is a rating given by the clinician on a scale known as the Global Assessment of Functioning (GAF). *American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders*, (4th ed. Text Revision 2000)(DSM-IV-TR).

[5] Plaintiff underwent screening for the Fragile X syndrome, but the results came back negative. (Tr. at pp. 649-50). Fragile X syndrome involves a defect in a particular gene that results in mental retardation.

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-** 7

ALJ did not err in failing to consider medical equivalency under Listing 112.05. Even Dr. Mabee, the medical advisor/expert, did not suggest mental retardation as a possible diagnosis.

**FUNCTIONAL EQUIVALENCE**

If an impairment does not meet or medically equal any listing, it may still result in limitations that functionally equal a listing. An impairment functionally equals a listing if it is of listing-level severity. An impairment is of listing-level severity if it results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R.§416.926a(a). Six "domains" are considered, including: (1) Acquiring And Using Information; (2) Attending And Completing Tasks; (3) Interacting And Relating With Others; (4) Moving About And Manipulating Objects; (5) Caring For Yourself; and (6) Health And Physical Well-Being. 20 C.F.R. Section 416.926a(b)(1).

A "marked" limitation exists when impairments "seriously" interfere with the ability to independently initiate, sustain, or complete activities. Day-to-day functioning may be seriously limited when impairments limit only one activity or when the interactive and cumulative effects of impairments limit several activities. A "marked" limitation is "more than moderate," but "less than extreme" and is the equivalent of functioning expected to be found on standardized testing with scores that are at least two, but less than three, standard deviations below the mean. 20 C.F.R. §416.926a(e)(2).

An "extreme" limitation exists when impairments "very seriously" interfere with the ability to independently initiate, sustain, or complete activities. Day-to-day functioning may be very seriously limited when impairments limit only one activity or when the interactive and cumulative effects of impairments limit several activities. "Extreme" limitation is the rating given to the worst limitations, although it does not necessarily mean a total lack or loss of ability to function. It is

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-** 8

the equivalent of functioning expected to be found on standardized testing with scores that are at least three standard deviations below the mean.  20 C.F.R. §416.926a(e)(3).

The ALJ found that plaintiff had "less than marked" limitation in the domain of acquiring and using information; "less than marked" limitation in the domain of attending and completing tasks; "less than marked" limitation in the domain of interacting and relating with others at school; a "marked" limitation in the domain of interacting and relating with others at home; "less than marked" limitation in the domain of moving about and manipulating objects; "less than marked" limitation in the domain of moving about and manipulating objects; "less than marked" limitation in the domain of caring for self; and "less than marked" limitation in the domain of health and physical well-being.  (Tr. at p. 33).

In making these findings, the ALJ relied on the hearing testimony of Dr. Mabee.  (Tr. at pp. 31-33 and  703-06).  The opinion of a non-examining medical advisor/expert need not be discounted and may serve as substantial evidence when it is supported by other evidence in the record and consistent with the other evidence.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  The ALJ rejected the opinions of  plaintiff's treating physicians, Dr. Wey and Roy Simms, M.D., regarding plaintiff's functional limitations.  It is settled law in the Ninth Circuit that in a disability proceeding, the treating physician's opinion is given special weight because of his familiarity with the claimant and his physical condition.  *Benecke v. Barnhart,* 379 F.3d 587, 592  (9th Cir. 2004); *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001) (quoting *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)); *Lester  v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996); *Smolen v. Chater,* 80 F.3d 1273, 1285-88 (9th Cir. 1996); *Flaten v. Secretary of Health and Human Serv*., 44 F.3d 1453, 1463 (9th Cir. 1995); *Fair v. Bowen*, 885 F.2d 597, 604-05 (9th Cir. 1989).  If the treating physician's opinion is not contradicted, it can be rejected only with clear and convincing reasons.  *Lester,* 81

**ORDER GRANTING DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT-** 9

F.3d at 830. If contradicted, the ALJ may reject the opinion if specific, legitimate reasons that are supported by substantial evidence are given. *See Flaten*, 44 F.3d at 1463; *Fair*, 885 F.2d at 605.

Dr. Simms began seeing the plaintiff in early 2001 in the role of general family practitioner. Although Dr. Simms was responsible for prescribing medication for the plaintiff's ADHD, the record indicates that he considered the plaintiff to be under the care of Dr. Wey, a psychiatrist, for "behavioral problems" and "medication management." (Tr. at p. 514). In March 2004, Dr. Simms completed part of a form ("Medical Report for Child") prepared by plaintiff's attorneys in which the doctor placed a check mark on lines indicating the plaintiff had a "marked" impairment in acquiring and using information and in attending and completing tasks. His explanation for the "marked" impairment in acquiring and using information was that the plaintiff was "on chronic medication for attention problems." (Tr. at p. 516). Dr. Simms left page 2 of the form blank, placing no checks on the lines relating to interacting and relating with others, moving about and manipulating objects, and caring for self. (Tr. at p. 517). On page 3 of the form, he indicated there was "no limitation" with regard to plaintiff's health and physical well-being. (Tr. at p. 518).

Dr. Wey began seeing the plaintiff in February 2003, following referral from Dr. Simms. (Tr. at p. 465). At that time, Dr. Wey assigned the plaintiff a CGAS (Child Global Assessment Score) of 50, indicating a moderate degree of interference in functioning.[6] (Tr. at p. 467). More specifically, the 41-50 range indicates:

---

[6] The CGAS is the child equivalent of a GAF (Global Assessment of Functioning) score for an adult. Schafer D, Gould MS, Brasic J, et al., (1983), A children's global assessment scale (CGAS). *Archives of General Psychiatry*, 40, 1228-1231.

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-** 10

> Moderate degree of interference in functioning in most social areas or severe impairment of functioning in one area, such as might result from, for example, suicidal preoccupations and ruminations, school refusal and other forms of anxiety, obsessive rituals, major conversion symptoms, frequent anxiety attacks, poor or inappropriate social skills, frequent episodes of aggressive or other antisocial behavior with some preservation of meaningful social relationships.

In November 2003, the plaintiff's father related to Dr. Wey that the plaintiff's school had advised that the plaintiff was fine when he was on his medications. (Tr. at p. 474). In December 2003, plaintiff's parents advised Dr. Wey that the plaintiff was getting better grades than he had gotten last year in school. (Tr. at p. 475). In a March 2004 "Progress Note," Dr. Wey indicated the plaintiff "does well in school." (Tr. at p. 593). In a June 2004 note, Dr. Wey indicated plaintiff's parents reported that plaintiff was "generally well behaved until 5:30 in the afternoon." (Tr. at p. 601). In November 2004, Dr. Wey noted that plaintiff's mother rated the plaintiff "quite highly on the Vanderbilt Scale with regard to ADHD symptoms." It occurred to Dr. Wey, however, that "the mother may be overstating his level of impairment" and therefore, Dr. Wey asked her to obtain the Vanderbilt forms from the plaintiff's main classroom teacher, as well as his special education teacher. (Tr. at p. 614). In January 2005, Dr. Wey noted that plaintiff was "generally well-behaved, and is performing adequately in school." (Tr. at p. 618). The doctor added that it was not clear what to do regarding the plaintiff's "evening behavior," but that it "may need to continue to be managed behaviorally." (*Id*.). In May 2005, Dr. Wey again assessed the plaintiff with a CGAS score of 50, although thereafter, he consistently assessed the plaintiff with a current GAF of 40, as well as that being his highest GAF in the past year. A CGAS/GAF of 31 to 40 indicates "[m]ajor impairment in functioning in several areas and unable to function in one of these areas, e.g. disturbed at home, at school, with peers or in society at large." (Tr. at pp. 553, 558, 566, 569, 577, 591 and 622).
///

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-** 11

In January 2006, Dr. Wey completed a form prepared by plaintiff's attorneys ("Medical Report for Child"). He checked lines indicating that plaintiff had a "marked" limitation in acquiring and using information, and in attending and completing tasks, due to his ADHD and learning disabilities. (Tr. at p. 692). He also checked a line indicating the plaintiff had a "marked" impairment in his ability to interact and relate with others due to his being an "odd child." (Tr. at p. 693). He indicated that there was "no limitation' in plaintiff's ability to move about and manipulate objects, and that there was a "less than marked" limitation in plaintiff's ability to care for himself. (*Id.*). He, however, indicated that plaintiff had a "marked" limitation in terms of his health and physical well-being due to the fact he had "multiple diagnoses." (Tr. at p. 694). He opined that all of the limitations reported had existed since February 21, 2003, the date he had first evaluated the plaintiff. (*Id.*).

Dr. Wey was somewhat inconsistent with his assessment of plaintiff's functioning, starting out with a CGAS/GAF score of 50 ("moderate"), reducing it to a 40 ("major" or "marked") for approximately two years, and then elevating it to 50 again before again reducing it to 40. Dr. Wey's indication of a "marked" impairment in terms of health and physical well-being is also directly at odds with Dr. Simms' indication that there was "no limitation" in that category. This is of significance since although Dr. Simms considered Dr. Wey to be the primary physician with regard to plaintiff's behavioral problems, the record indicates that Dr. Simms was the primary physician with regard to plaintiff's physical problems.

With regard to plaintiff's behavioral issues, the fact of the matter is that both Dr. Wey and Dr. Simms would only see the plaintiff periodically for short visits and out of necessity, had to rely to a significant extent on what the plaintiff's parents reported and just as importantly, what the plaintiff's teachers reported. The ALJ offered clear and convincing detailed reasons supported by substantial evidence in the record for calling into question the credibility of plaintiff's mother

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-** 12

with regard to her reports of the severity of the plaintiff's behavior problems. (Tr. at pp. 33-34). Plaintiff does not challenge the ALJ's credibility analysis, but instead contends the physicians, as independent professionals, could not have overrated plaintiff's behavioral impairments. Plaintiff's educational records, however, also support the ALJ's determination that Drs. Simms and Wey overrated the limitations resulting from plaintiff's behavioral impairments. Those records include observations by teachers who spent considerable time around the plaintiff. Dr. Mabee relied on those records in offering his opinion about the plaintiff's limitations and the ALJ (Tr. at pp. 703-06), who relied on that opinion, cited those records in her decision (Tr. at pp. 31-33). It is noted that plaintiff filed a previous application for benefits in October 1998 which was denied initially and on reconsideration before a hearing was held in March 2002. In his decision denying benefits, dated May 6, 2002, ALJ Verrell L. Dethloff cited heavily to the plaintiff's educational records in concluding that plaintiff had "less than marked" limitations in acquiring and using information and in attending and completing tasks; and no limitation in interacting and relating with others, moving about and manipulating objects, and caring for self. (Tr. at pp. 52-53). The Appeals Council dismissed a request for review of the ALJ's decision and no further review was sought, making the May 6, 2002 decision final and binding, thereby conclusively establishing that plaintiff was not disabled at anytime through May 6, 2002. (Tr. at p. 20). The post-May 6, 2002 record does not evidence an appreciable worsening of plaintiff's abilities to acquire and use information, attend and complete tasks, interact and relate with others, move about and manipulate objects, and to care for himself. And indeed, as noted above, plaintiffs' parents made various statements to Dr. Simms and Dr, Wey indicating that things were going okay for the plaintiff in

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-** 13

school.⁷ In the end, there is substantial evidence in the record to support the ALJ's notion that plaintiff's behavioral problems are due in significant part to environmental factors within the home.⁸

The ALJ offered specific and legitimate reasons for rejecting the functional limitations opined by Drs. Simms and Wey. Those reasons are supported by substantial evidence in the record, including the opinion of Dr. Mabee which itself is supported by substantial evidence in the record. Accordingly, substantial evidence supports the ALJ's determination that plaintiff does not have an impairments which functionally equal a listed impairment.

//
//
//
//
//
//
//
//

---

⁷ Plaintiff's stepfather made similar statements. In October 2005, he reported that plaintiff seemed to be doing well in the fourth grade at Nob Hill Elementary School. (Tr. at p. 545). Earlier, in August 2005, the "future" stepfather reported that plaintiff was doing well and showing less signs of ADHD, although the "[m]ornings continue to be ruff (sic) due to the simple fact that there is no structure and the kids are able to run wild until parents wake up to restore order." (Tr. at p. 565). Also, in August 2005, the stepfather reported that things were going "very well" in terms of the plaintiff's overall behavior. (Tr. at p. 574).

⁸ "Behavioral difficulties in the home appear to be influenced by an inconsistent environment." (Tr. at p. 192). "[N]egatively reinforced situation at home." (Tr. at p. 196). "Significant environmental, cultural, and economic concerns in the family." (Tr. at p. 364).

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT-** 14

## CONCLUSION

Plaintiff's motion for summary judgment (Ct. Rec. 23) is **DENIED** and defendant's motion for summary judgment (Ct. Rec. 28) is **GRANTED**. Pursuant to 42 U.S.C. §405(g), the Commissioner's decision denying benefits is **AFFIRMED**.

**IT IS SO ORDERED.** The District Executive shall enter judgment accordingly and shall forward copies of the judgment and this order to counsel.

**DATED** this  27th  of June, 2007.

           s/ Alan A. McDonald           
           ALAN A. McDONALD
       Senior United States District Judge

**ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT-** 15